797 S.W.2d 837 (1990)
In the Interest of: T.S., C.S., Jr., S.S., and B.S., Respondents,
v.
P.S., Appellant.
No. WD 42442.
Missouri Court of Appeals, Western District.
September 25, 1990.
Motion for Rehearing and/or Transfer Denied October 30, 1990.
*838 Richard L. Colbert, Kansas City, for appellant.
Anne E. Rauch, Kansas City, for respondents.
John W. Kurtz, Kansas City, for respondent guardian ad litem.
Before LOWENSTEIN, P.J., and FENNER and ULRICH, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied October 30, 1990.
LOWENSTEIN, Presiding Judge.
Appellant P.S., natural mother of B.S., T.S., C.S., and S.S. appeals a judgment terminating her parental rights. The court also terminated the natural father's parental rights, but he does not appeal.
The judgment is affirmed.
The four children are as follows: female child B.S., born November 11, 1983; female child T.S., born December 16, 1984; male child C.S., born January 27, 1986; and male child S.S., born April 15, 1987. The mother and father began having these children at the ages of 14 and 19, respectively.
The facts will be presented in two parts. The first part chronologically outlines the events leading to the termination of the mother's and father's rights, even though the judgment as to him is final. The second part outlines the Division of Family Services' (DFS) efforts to rehabilitate the S. family.

ORDER OF EVENTS
DFS investigated the family after receiving hotline tips on April 22, and May 10, 1986, alleging physical neglect of B.S., T.S., and C.S. (S.S. was not yet born). DFS first inspected the home in May 26, 1986. The home's two toilet stools were broken and filled with human and animal feces. Soiled diapers were scattered about the furniture and floors; trash bags overflowed with garbage and dirty clothes; and flies infested the home. The children and their clothes also were dirty.
DFS visited the home many additional times. Each visit revealed the squalid living conditions had not improved from the *839 original visit. In fact, DFS discovered additional problems during each visit. On July 9, 1986, DFS found that B.S. and C.S. were infested with lice and nits. On July 30, 1986, DFS discovered fly and cockroach infestation. On August 29, 1986, all of the children were infested with lice. On October 3, 1986, the home was so cluttered with building materials that much of it was impassable. C.S. and T.S. had skin rashes. B.S. and T.S. were drinking spoiled milk. Human and animal feces covered the house. DFS removed the children from the S. home on the same day.
October 10, 1986, the Jackson County Juvenile Officer filed a petition asking the court to assume jurisdiction over B.S., T.S. and C.S. under § 211.031.1 (RSMo.Supp. 1989).[1] The petition alleged that the children were without proper care, custody, and support in that their parents habitually failed to provide a clean, healthy, safe living environment. Before the petition was ruled upon, DFS returned the children to their parents on December 9, 1986, because the parents moved to a four bedroom home and kept it and themselves clean and lice-free. Juvenile Court took jurisdiction over B.S., T.S., and C.S. on January 20, 1987, but allowed mother and father to retain physical custody.
DFS received additional hotline calls on May 18, June 12, and August 28, 1987. DFS again investigated the home on August 29, 1987, and found the home as filthy and putrid as usual. Mother and father provided no food or running water. The three oldest children slept on a bare, filthy mattress on the floor, which was covered with garbage, soiled clothing, soiled diapers, and animal feces. Four dogs and three cats also lived in the home.
DFS removed the children from the home that day and placed them in foster care on October 2, 1987. B.S. was about three years, ten months of age; T.S., two years, nine months; C.S., one year, seven months; S.S. four months. The children have never returned to their parents' custody.
B.S. and T.S. began exhibiting sexually dysfunctional behavior in November 1987. They indicated that their father and a grandfather were the perpetrators.
Juvenile Court subsequently took jurisdiction over S.S. on March 3, 1988, by granting the Juvenile Officer's third amended petition filed under § 211.031 (RSMo.Supp.1989). In that proceeding, mother, father, the Juvenile Officer, and Guardian Ad Litem stipulated to the following: the family was dysfunctional and the children were without proper care, custody and support because on or about September 29, 1987, the family home was without running water; there was virtually no food in the house; the floors were strewn with garbage, trash, clothing, soiled diapers and animal feces; the children T.S., B.S., and C.S. were required to sleep on a bare mattress on the floor; there were four dogs and three cats in the home; the children were filthy and malodorous; counseling was required for all family members to address the sexually dysfunctional behavior of B.S. and T.S.; and both parents consented to DFS' recommendation that all four children be placed in DFS custody for foster care placement, pending further review by the court.
On November 17, 1988, the Juvenile Officer moved under § 211.447.2(3)(a), (b) for termination of both parents' rights to all four children. The termination proceedings began July 12, 1989. The Juvenile Officer offered extensive evidence that mother and father failed to take advantage of DFS services and failed to improve the living conditions in the home. The parents testified DFS had not recently visited and that the home was currently clean enough to meet DFS standards. The father testified he was currently employed and ready to take responsibility for his family. The court tabled the proceedings and instructed DFS to investigate the home again. The court also instructed that father's employment be verified. When the trial reconvened, DFS presented testimony and photographs *840 showing the home's conditions had not improved one iota since the original home visit. The father's employer was subpoenaed but failed to appear.
The trial court made several findings of fact under § 211.447.2(3)(a), (b). It found that the children had been under the juvenile court's jurisdiction for more than one year and that conditions of a potentially harmful nature continued to exist; that these conditions were likely to persist and prevent reunification; that a continuation of the parent-child relationship would significantly diminish the children's chances of early integration into a stable, permanent home; that mother and father failed to comply with six separate social service plans, discussed infra; and that DFS had been unsuccessful in aiding mother and father on a continuing basis in adjusting their circumstances and conduct to provide a proper home for the children. Thus, the court terminated the mother's and father's parental rights to all four children under § 211.447.2(3)(a)(b).

THE EFFORTS OF DFS
From May 1986 through May 1989, DFS offered mother and father extensive services to improve their living conditions and parenting skills. For example, DFS procured a community service aide to teach skills in time management, personal hygiene, housekeeping, nutrition, and food preparation and storage. DFS offered them parenting instruction, psychiatric and social work counseling, day care facilities for their children, aid in obtaining and maintaining suitable housing, and aid in finding steady employment. All of these services were terminated because mother and father were uncooperative. Specifically, they failed to: (1) regularly attend therapy, counseling and parenting education sessions; (2) regularly be at home or answer the door when the community service aide visited; (3) regularly give prior notice that they would miss appointments; (4) regularly call to reschedule missed appointments; (5) remove lice eggs from the children's hair to prevent their expulsion from day care; and (6) improve and maintain the improvement of their living conditions.
The mother and father entered into six separate social service "contracts" with DFS between July 16, 1986, and April 24, 1989. These agreements covered basic daily living activities. The parents agreed to, among other things, clean house on a daily basis; provide a safe and healthy home environment for the children; rid the children of head lice; be available for home visits with DFS and the community service aide; feed the children three well-balanced meals a day; pursue adequate housing with working utilities; bathe the children; attend parenting classes and sex abuse counseling sessions; not take in any more animals; clean up after the animals; and get beds and blankets for the children. The trial court specifically found mother and father failed to comply with these agreements.
The court's order will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. In Interest of D.R.M., 780 S.W.2d 145, 146 (Mo.App.1989). Furthermore, this court will defer to the trial court on issues of witness credibility and choosing between conflicting evidence, In Interest of B.A.F., 783 S.W.2d 932, 933 (Mo.App.1989), and will review the facts and their reasonable inferences in the light most favorable to the trial court's order. In Interest of M.E.W., 729 S.W.2d 194, 196 (Mo. banc 1987). In Interest of R.H.S., 737 S.W.2d 227, 236 (Mo.App.1987). This burden is met only by clear, cogent and convincing evidence. Id.; § 211.447.2. Specifically, this is evidence which convinces the fact finder it is true when weighed against contrary evidence. In Interest of R.H.S., 737 S.W.2d at 236.
The mother argues three points on appeal. First, that the March 3, 1988, order granting DFS custody of the children *841 failed to comply with procedural requirements of § 211.183.5 (RSMo.Supp.1989). This section provides:
5. Before a child may be removed from the parent, guardian, or custodian of the child by order of a juvenile court, excluding commitments to the division of youth services, the court shall in its orders:

(1) State whether removal of the child is necessary to protect the child and the reasons therefor;
(2) Describe the services available to the family before removal of the child, including in-home services;
(3) Describe the efforts made to provide those services relevant to the needs of the family before the removal of the child;
(4) State why efforts made to provide family services described did not prevent removal of the child; and
(5) State whether efforts made to prevent removal of the child were reasonable, based upon the needs of the family and child. (Emphasis added.)
Mother contends that such a procedural error taints this subsequent termination action, and amounts to a denial of due process. In effect, mother asks that these termination proceedings and the prior custody action in March 1988 be set aside.
This point has not been preserved for appeal. Mother and father were separate, independent parties at trial. At trial, only the father moved to dismiss the termination proceedings on the grounds that the dispositional (custody) order of March 3, 1988, did not comply with § 211.183 (RSMo. Supp.1989). The trial court denied his motion, and he did not appeal. Where several parties are entitled to object, an objection made by only one party will not inure to the benefit of the party or parties not joining in the objection. Thomas v. Bank of Springfield, 631 S.W.2d 346, 351 (Mo.App. 1982). The mother cannot now, at the appellate level, take advantage of her co-defendant's objection at trial.
The mother characterizes the dispositional order's failure to comply with § 211.183 (RSMo.Supp.1989) as a denial of her due process. Even if it were so, "constitutional questions must be raised at the first opportunity consistent with orderly procedure." In Interest of R.H.S., 737 S.W.2d at 233. Mother did not raise this issue for the first time until the appeal. The Missouri Supreme Court and appellate courts have regularly "rejected consideration of a constitutional question when raised for the first time on appeal." Id. Thus, the constitutional claim is denied.
This court further declines to rule favorably on the mother's procedural issue because she further failed to file timely notice of appeal of the March 3, 1988, order. She could have timely filed under § 211.029 (RSMo.Supp.1989) or under Rule 120.01. Section 211.029 provides that a minor's parent is "entitled to file with the court a motion for a hearing by a judge of the juvenile court within fifteen days after receiving notice of the findings of the commissioner... [I]f no such motion is filed, the findings and recommendations of the commissioner shall become the decree of the court when adopted and confirmed by an order of the judge ..." Mother did not file a motion for rehearing under this statute. She does not now claim she never received notice.
Mother also could have filed a timely notice of appeal of the dispositional order under Rule 120.01. This Rule provides that "an appeal shall be allowed to a parent from any final judgment made under the Juvenile Code which adversely affects him. Notice of appeal shall be filed within thirty days after entry of final judgment." Rule 120.01(b) and (c). The mother failed to appeal the procedural irregularities of the March 3 order within this statutory period.
Mother now raises this procedural issue for the first time nearly two years after her time for appeal expired. She erroneously relies on In Interest of A.L.W., 773 S.W.2d 129 (Mo.App.1989). In A.L.W., a *842 dispositional order was set aside because it failed to comply with § 211.183 (RSMo. Supp.1989). The appeal was timely filed. In this case, however, mother did not timely appeal the dispositional order. Instead, mother's appeal was filed after the termination judgment became final. A.L.W. does not apply.
Even though this issue was neither preserved nor timely appealed, this court gratuitously grants review under the plain error standard. Rule 84.13(c). Failure of the 1988 dispositional order to comply with § 211.183 (RSMo.Supp.1989) does not amount to a miscarriage of justice or result in a manifest injustice. The Juvenile Officer presented clear, cogent and convincing evidence to support termination of her parental rights regardless of compliance with § 211.183. This point is denied.
Her second point on appeal is that there was no showing that DFS used all available services on a continuing basis to prevent the children's removal from the home and to help in reuniting the family.
The mother does not cite specific authority for this point. To give her the benefit of the doubt, this court assumes she refers to § 211.447.3(4), which states the trial court must make a finding of fact on "whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time ..." The trial court found that additional services would not rehabilitate the family.
The record reveals DFS' many efforts to rehabilitate and reunite the family. DFS provided extensive services, outlined above, to improve mother's parenting and housekeeping skills. DFS also arranged for counseling and daycare. All of these services were terminated because the mother would not regularly attend sessions or rescheduled appointments.
Mother argues that because she has no car and no telephone, her absences from education and counseling sessions should be excused. She claims she has no money for bus fare or phone calls. Yet, the transcript shows the mother is a smoker and is able to obtain cigarettes. Furthermore, the community service aide provided in-home service. This service was discontinued because the mother often did not keep appointments or answer the door when the aide arrived. The children received day care services. These were discontinued, however, because their mother did not keep her children lice-free despite being supplied with proper shampoo and instruction on how to disinfect the house.
The appellant claimed she couldn't keep the home clean because of the workload created by her four young children. Yet, she did not keep the home clean after the children were removed on October 2, 1987. Many cats and dogs fouled the home, yet she did not get rid of them. Instead, DFS removed the children.
The mother's unwillingness to provide a better home environment profoundly affected her children. Three of the children were considerably developmentally delayed. One could not speak, only babble. Another's motor coordination was so poor he had to be taken to the hospital many times. The youngest was "a failure to thrive" baby, which means he did not gain weight. The DFS worker discovered the baby would not eat unless the mother held him close to her body. The DFS worker explained the problem and showed the mother how to feed the baby, but the mother would not follow instructions. Instead, she left the baby in a playpen with a bottle beside him.
Mother claims she has matured enough to provide a safe, clean, healthy environment for her children. She also testified at the termination hearing that her home was currently clean. The judge tabled the proceedings so that a DFS worker could inspect the home that day. DFS found the home in the same filthy condition as the original visit in 1986.
The mother claims she wants her children and is willing to accept responsibility *843 for them. Mere promises to be a better parent and professions of love will not suffice. These promises must be supported by actions. At no time after placement of the children in foster care on October 2, 1987, did mother maintain the home in a sanitary, safe manner. Granted, she participated in service agreements to improve their living conditions. But "... mere participation in service agreements is not sufficient. Parents must make a commitment to change the course of their conduct which prevents the return of their children." In Interest of R.H.S., 737 S.W.2d at 236.
The mother does not specify which additional services would permanently change her conduct. She merely states in her brief that "clearly, [Mother] required more services, not less," and that she should have been given "special" services. The mother claims that DFS did not assist her in getting Aid to Dependent Children relief or food stamps. The record shows, however, that mother received two A.F.D.C. checks but was later declared ineligible because she failed to cooperate with DFS. Further, the record shows that DFS repeatedly encouraged her to apply for food stamps.
This court holds that the juvenile officer presented clear, cogent and convincing evidence to support the trial court's finding that additional services would have been unlikely to have brought about a lasting parental adjustment enabling the children's return to mother within an ascertainable period of time. The appellant's second point on appeal is denied.
The mother's third point on appeal is that because the court failed to approve the social service plans, there was no substantial evidence that additional services would not be likely to bring about lasting parental adjustment and result in reunification. The mother erroneously relies on In Interest of R.H.S., 737 S.W.2d at 237. R.H.S. does not hold that a treatment plan must be approved by the court. Rather, it states in dicta that § 211.447.2(3)(a) implies "the necessity of a social service plan." Mother also erroneously relies on In Interest of B.L.E., 768 S.W.2d 86 (Mo.App.1988). The B.L.E. court applied the 1982 version of § 211.447, which required the court approval of social service plans. In this case, however, the 1985 version of § 211.447 applies. This version does not require the court approve social service plans. Furthermore, this court has held that § 211.447 "no longer requires court approval of a social service plan under any ground for termination." In Re H.K., 762 S.W.2d 465, 469 (Mo.App.1988). Thus, mother's third point on appeal is denied.
The greatest concern in a parental rights termination case is the best interest of the child. In Interest of M.B., 768 S.W.2d 95, 97 (Mo.App.1988). The trial court specifically found by clear, cogent, and convincing evidence that a continuation of the parent child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home. The court terminated father's parental rights. He and mother still live together. Mother asks that the children be returned to her home despite unresolved allegations of sexual abuse. The children are now about six, five, four, and three years of age. They have not lived with their mother since they were three, two, one, and less than one years old. All have shown steady physical, emotional and intellectual development in foster care. With termination final, they will be available for adoption. There is no guarantee the children will be adopted, but cutting off the parental rights of a mother who has failed to provide adequate food, shelter, and guidance will only increase their chances of having healthy and successful lives.
The trial court's order terminating mother's parental rights to her four children is affirmed.
NOTES
[1] All references are to Revised Statutes of Missouri 1986 unless otherwise indicated.