**In the Interest of R.G.**

No. 64263.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 18, 1994.

Gary T. Soule, Carl James Lumley, Clayton, for appellant.

Nancy Lee Sido, Thea Anne Sherry, Clayton, for respondent.

## CARL R. GAERTNER, Judge.

K.K. (Mother) appeals from an order entered by the Juvenile Division of the Circuit Court of St. Louis County finding that it had jurisdiction over R.G., Mother's natural daughter, due to medical neglect, and placing R.G. in the legal and physical custody of her natural father, L.G. (Father).

We state the facts in the light most favorable to the juvenile court's order. R.G. was born on October 1, 1989, at Jewish Hospital in St. Louis. The next day, R.G. suffered a seizure and was transferred to St. Louis Children's Hospital. During the course of R.G.'s stay at Children's Hospital, Mother and Father refused to permit the performance of various diagnostic tests and therapeutic interventions, disregarded hospital rules, and argued with physicians and nurses.

On October 10, 1989, Mother and Father transferred R.G. to St. John's Mercy Medical Center. R.G. was diagnosed as suffering from hyperinsulinemic hypoglycemia,[1] a condition that can lead to fainting, seizures, apnea, brain damage or death[2] if not properly treated by a pediatric endocrinologist. Hyperinsulinism is caused by a tumor in the pancreas or by the enlargement of insulin-producing cells in the pancreas.

On October 14, 1989, Dr. Patricia Wolff, a pediatric endocrinologist practicing at St. John's, began treating R.G. She explained to R.G.'s parents the importance of determining the cause of R.G.'s hyperinsulinism. If the cause was a tumor, Dr. Wolff explained, it could be surgically removed. The most accurate way to determine the cause of hyperinsulinism is to thread a catheter into the pancreas and extract various blood samples. Less accurate testing methods include taking a CT scan, an MRI or an ultrasound of the pancreas. Dr. Wolff and the parents agreed to have an ultrasound taken of R.G.'s pancreas. The test did not show a tumor; however, it failed to give a clear picture of her entire pancreas. Mother and Father refused to have a CT scan taken of R.G.'s pancreas.

Dr. Wolff explained to Mother and Father that the most common methods of treatment available to stabilize and control R.G.'s hyperinsulinemic hypoglycemia include: (1) frequently feeding the child, usually every three to four hours; (2) administering diazoxide medication; or (3) performing a pancreatectomy in which 95% of the pancreas is surgically removed. Mother and Father chose the frequent feeding method. Dr. Wolff instructed the parents to feed R.G. every three and a half hours, regularly monitor her blood sugar level and report the readings to Dr. Wolff. She also pointed out that this method was too difficult to sustain and would only be a short-term option to see if R.G. would recover spontaneously. If this method failed, Dr. Wolff told Mother and Father, they would then try diazoxide treatment.

On October 18, 1989, St. John's "reluctantly discharged" R.G. to her parents. Dr. Wolff soon noted that Mother and Father were failing to maintain an appropriate feeding schedule and that R.G. continued to have dangerously low blood sugar readings. In late October and early November 1989, Dr. Wolff repeatedly recommended that R.G. be placed on diazoxide; Mother and Father refused. On November 20, 1989, Dr. Wolff recommended that R.G. be rehospitalized to evaluate her insulin and blood sugar levels to prove whether medication was necessary to control her condition; Mother and Father refused. They also informed Dr. Wolff they were soon going to put R.G. in day care. Dr.

---

1. Hypoglycemia refers to an abnormally low concentration of sugar in the blood. Hyperinsulinism refers to chronic excessive secretion of insulin from the pancreas, resulting in persistent hypoglycemia.

2. Because the brain functions almost exclusively on glucose (sugar), these symptoms will persist if the blood reaching the brain has an insufficiently low concentration of glucose.

Wolff testified that their failure to rehospitalize R.G. was medical neglect.

Thereafter, Dr. Wolff repeatedly attempted to contact the parents to no avail. In a letter dated December 4, 1989, which she sent to Mother and Father, Dr. Wolff withdrew from treating R.G. In the letter, she outlined R.G.'s condition and detailed the risks of the child's condition, the available medical treatments and the parents' failure to cooperate and seek necessary medical care. She also explained that it was dangerous to ignore R.G.'s condition. Dr. Wolff testified that the parents "basically didn't think [R.G.] had any problem. . . . I perceived it as a tremendous amount of denial."

From November 20, 1989, until early February 1990, Mother and Father continued to follow the frequent feeding method; however, R.G. was not under the care of a pediatric endocrinologist, and Mother and Father did not regularly monitor her blood sugar level. Dr. Maurice Lonsway, R.G.'s pediatrician, regularly saw R.G. during this time period, but Mother and Father did not inform him that R.G.'s hypoglycemia was caused by hyperinsulinism. Dr. Lonsway had no expertise or experience in treating such a condition. During this time period, R.G. also exhibited unusual eye movements. Mother and Father took her to a neurologist for evaluations. They told the neurologist R.G. suffered from hypoglycemia but never mentioned her hyperinsulinism.

On February 13, 1990, R.G. showed signs of profound hypoglycemia. Mother and Father took her to the emergency room at St. John's Mercy Medical Center. R.G.'s blood sugar level was tested and initially was so low it was "not detectible." That night, R.G. was transferred to Cardinal Glennon Children's Hospital where she remained hospitalized until March 15, 1990, under the care of Dr. Thomas Aceto, a pediatric endocrinologist.

From February 13 to February 26, 1990, R.G.'s condition was potentially life-threatening. During this time, Mother and Father refused to give permission to Dr. Aceto to perform diagnostic tests to determine the cause of R.G.'s hyperinsulinism. Furthermore, Mother and Father refused to give Dr.

Aceto permission to place a central line to R.G.'s vena cava to facilitate the injection of glucose into her body. Dr. Aceto explained the procedure was critical to controlling R.G.'s blood sugar level because he was unable to do so by injecting glucose in R.G.'s smaller peripheral veins and R.G. was not sucking and thus could not take glucose orally. Dr. Aceto also felt the procedure was necessary to prevent or quickly treat any recurrence of hypoglycemia. Mother resisted most of Dr. Aceto's suggestions regarding treatment, would not listen to his explanations and was hostile to him and the hospital staff at Cardinal Glennon.

Mother and Father contacted Dr. Wolff and begged her to treat R.G. again. Dr. Wolff testified that she refused the parents' request because "they really had a tremendous amount of denial about [R.G.'s] problem and, also, a tremendous suspicion and lack of trust in physicians, I mean, much more so than other people do, I mean, just not able to trust any physician anywhere."

On February 23, 1990, the Juvenile Division of the Circuit Court of the City of St. Louis issued an order placing R.G. in the protective custody of the Division of Family Services (DFS). On February 26, 1990, the Juvenile Officer of St. Louis filed a petition alleging that R.G. was without proper care, custody and support due to Mother and Father's refusal to permit the performance of diagnostic tests and to provide recognized medical treatment for R.G. On the same day, the court issued an order permitting the placement of a central line to R.G.'s vena cava. On March 2, 1990, the court transferred the neglect proceeding to the Juvenile Division of the Circuit Court of St. Louis County. On April 12, 1990, the case was dismissed without prejudice.

Dr. Aceto discussed with Mother and Father the medical treatments available to control R.G.'s condition. Mother wanted to continue the frequent feeding method. Dr. Aceto explained that using this treatment would be unsafe based upon the parents' past record of unreliability. He recommended that they try diazoxide treatment. Mother and Father acquiesced. R.G. was discharged on

March 15, 1990, to Mother and Father with instructions that they administer diazoxide to R.G. three times a day, feed R.G. three meals every day with several in-between feedings and take daily blood sugar readings with a reflectance meter.

Dr. Aceto continued to meet with Mother and Father and monitored R.G.'s condition on an outpatient basis. In the summer of 1990, Dr. Aceto directed Mother and Father to allow the child to fast for an eight-hour period every night before reading R.G.'s blood sugar level in the morning. He extended the fasting period to 10 to 12 hours in the fall of 1990. Dr. Aceto explained that he needed blood sugar readings following a fasting period to prescribe the proper dose of diazoxide for R.G.[3] Throughout R.G.'s treatment under his care, Dr. Aceto continued to decrease R.G.'s medication based upon the blood sugar level readings taken by the parents.

Mother and Father testified that they followed a fasting period for R.G. of three to six hours through the summer of 1990 and six to eight hours during the fall of 1990 and winter of 1991. However, Mother told Dr. Aceto she was following his prescribed fasting schedule. Father testified that R.G.'s nighttime fasting period was never as long as Dr. Aceto's prescribed schedule, that both he and Mother fed R.G. during the prescribed fasting period, and that he did not report these deviations from the schedule to Dr. Aceto until February 1991.

Because some of R.G.'s blood sugar readings were high in relation to her daily dose of diazoxide, Dr. Aceto became concerned that Mother and Father were not truthfully reporting the length of R.G.'s nighttime fasts. On January 31, 1991, Dr. Aceto proposed that Mother and Father rehospitalize R.G. to obtain precise measurements of her blood sugar level and to establish an appropriate nighttime fasting period to determine whether he could discontinue her diazoxide treatment. Dr. Aceto explained that rehospitalization was essential in attempting to discontinue R.G.'s medication because it would allow rapid intervention in case of an emergency. Any attempt to discontinue R.G.'s medication without hospital staff supervision, he pointed out, would pose a "significant danger" to R.G. Mother refused Dr. Aceto's request, and Father remained silent.

On March 11, 1991, Mother and Father sought the advice of Dr. Fred Hall, an osteopath inexperienced in endocrinology practicing in Kansas City, regarding whether they needed to rehospitalize R.G. to discontinue her diazoxide treatment. Dr. Hall advised that it was not essential that R.G. be hospitalized in attempting to discontinue her medication. Neither parent fully divulged R.G.'s true condition to Dr. Hall. Father testified that after the consultation Mother said she was going to stop giving diazoxide to R.G. He further testified that Mother did not give R.G. her afternoon or evening doses of diazoxide and that he administered a dose that night without informing Mother. Mother read R.G.'s blood sugar level the following morning, found the result higher than normal and stated that it proved R.G. did not need medication. After Mother left to work, Father administered another dose of diazoxide. He later took R.G. to the juvenile court in St. Louis County and spoke to Mike Potts, a deputy juvenile officer, who told Father to return the next day.

Father returned with R.G. on March 13, 1991, to meet Potts at his office at the juvenile court. Thereafter, a commissioner of the Juvenile Division of the Circuit Court of St. Louis County issued a protective custody order under § 210.125 RSMo.1986, placing R.G. in the temporary custody of the DFS and giving Father physical custody of R.G., provided he cooperate with the court and medical and juvenile personnel. Mother was to have no contact with R.G. until further court order.

On March 14, 1991, Father signed a petition for dissolution of marriage which was filed in another division of the St. Louis County Circuit Court. The disposition of this matter is not disclosed by the record, but

---

**3.** Feeding R.G. more frequently than advised, Dr. Aceto testified, would have been dangerous because it would have elevated R.G.'s blood sugar level. This in turn would have prompted him to cut back R.G.'s daily diazoxide dose, subjecting her to the risk of severe hypoglycemia.

Mother and Father have remained separated since that date.

On March 15, 1991, the Juvenile Officer of St. Louis County filed a petition asking the juvenile court to assume jurisdiction over R.G. under § 211.031.1(1)(a) RSMo.Supp. 1993.[4] The petition alleged that R.G. was without proper care, custody and support because: (1) from April 1990 to March 1991, Mother and Father failed to follow medical instructions by feeding R.G. during prescribed periods of fasting; (2) in March 1991 Mother failed on at least one occasion to give R.G. her prescribed medicine, and Father later gave R.G. the medicine without informing Mother; (3) on March 13, 1991, after R.G. was taken into protective custody, Mother attempted to forcibly remove R.G. from the St. Louis County Juvenile Court Neglect Unit; and (4) from February 13, 1990, to February 26, 1990, Mother and Father resisted and refused to permit physicians to perform diagnostic tests on R.G. or to provide recognized medical treatment, which placed the child at risk of medical harm. The Juvenile Officer amended the petition on July 31, 1991, to include an allegation that Mother and Father neglected R.G. or refused to provide R.G. proper medical care from October 2, 1989, to February 12, 1990, by refusing to allow necessary diagnostic tests to be performed to determine the cause of her condition and by refusing to administer medication to control her condition.

On March 28, 1991, the commissioner amended the initial protective custody order, granting Mother visitation rights with R.G., as arranged and supervised by the DFS. Under this amendment, Mother was restricted to one-hour supervised visits with R.G. twice a month. In November 1991, the DFS permitted Mother to start visiting R.G. once per week for two hours.

On March 25, 1992, following a hearing, the commissioner found that the allegations of medical neglect, except the allegation that Mother attempted to forcibly remove R.G. from protective custody, were true. The commissioner concluded that R.G. came within the juvenile court's jurisdiction under § 211.031.1(1)(a).

In a hearing which began on September 4, 1992, in addition to the facts set forth above, evidence was presented concerning R.G.'s care since March 13, 1991. During this time, Dr. Aceto continued to treat R.G. for hyperinsulinemic hypoglycemia. He testified that Father's cooperation and interaction with medical personnel had been excellent and that Father conscientiously monitored R.G.'s condition and followed all medical instructions in caring for her. A DFS employee testified that on a number of occasions during her supervised visits with R.G. Mother made disparaging remarks about Dr. Aceto, Father and the medical care of R.G.

In his recommendation order issued on December 29, 1992, the commissioner found that Mother "never wavered from her course of conduct, uncooperativeness and lack of complete truthfulness with the medical professionals treating [R.G.]" and that she still exhibited a "tremendous amount of anger" toward Father and Dr. Aceto. The commissioner further found that Father, despite his participation through overt action and inaction in the neglect of R.G., brought the potentially dangerous situation to the attention of Dr. Aceto and juvenile authorities, that he had been the proper custodial parent for R.G. since she was taken into protective custody, that he had provided her with proper care and that he had cooperated with the DFS and the medical personnel treating R.G.

The commissioner then recommended that: (1) the juvenile court exercise continuing jurisdiction over R.G.; (2) R.G. be placed under the supervision of the DFS; (3) legal custody of R.G. be placed with Father; (4) Mother be granted visitation and temporary custody of R.G., as arranged and approved by the DFS; and (5) Mother pay child support to Father. Mother filed a motion for a rehearing. On June 1, 1993, the Juvenile Division of the Circuit Court of St. Louis County issued a final order in which it granted Mother's rehearing motion in part as it related to child

4. Unless otherwise noted, all statutory references hereafter are to Revised Statutes of Missouri 1993 Supplement.

support payments and denied the remainder of her motion. The court ratified, adopted and confirmed the remainder of the commissioner's findings and recommendations.

■ Our review of juvenile proceedings is similar to our review of court-tried civil cases. The trial court's order is the judgment from which this appeal is taken. *In the Interest of L.W.*, 830 S.W.2d 885, 886 (Mo. App.1992). As such, it will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In the Interest of L.J.M.S.*, 844 S.W.2d 86, 91 (Mo.App.1992). We will defer to the trial court on issues of fact and the credibility of witnesses. *L.J.M.S.*, 844 S.W.2d at 91; *T.S. v. P.S.*, 797 S.W.2d 837, 840 (Mo.App.1990).

## I.

In her first point, Mother contends the juvenile court erred in finding that R.G. came within the court's jurisdiction pursuant to § 211.031.1(1)(a). Mother raises five arguments in support of this claim. First, she argues the allegation that she and Father committed medical neglect from October 2, 1989, to March 1990 was too remote in time to constitute neglect of a *present need,* as required by § 211.031.1(1)(a), and the conduct was already addressed in a previous, closed juvenile court proceeding. Second, she contends the court's finding that she and Father committed medical neglect by failing to rehospitalize R.G. in January 1991 was not supported by clear and convincing evidence and that such conduct was not charged in the petition. In her final three arguments, Mother contends the allegations that she and Father committed medical neglect by interrupting R.G.'s medically prescribed fasting from March 1990 to January 1991, seeking the advice of an osteopath and failing to give R.G. her medication on March 11, 1991, were not supported by clear and convincing evidence.

■ At the outset, we must address the Juvenile Officer's contention that Mother failed to preserve this point for appellate review. The officer contends Mother only alleged in her motion for a rehearing that the commissioner's findings were against the weight of the evidence; therefore, she failed to preserve for appellate review her contention of jurisdictional error. This argument is meritless. "Jurisdiction can be raised at any time, even on this court's own motion." *In the Interest of E.S.*, 851 S.W.2d 676, 681 (Mo.App.1993).

■ To assert jurisdiction under § 211.031.1(1)(a), the juvenile court must find clear and convincing evidence that the child is in need of care which has arisen because the child's parents neglected to provide medical care necessary for the child's well-being. *E.S.*, 851 S.W.2d at 680; *In the Interest of L.J.M.S.*, 844 S.W.2d 86, 92 (Mo.App.1992). In reviewing the sufficiency of the evidence, we consider the evidence and all reasonable inferences which might be drawn therefrom in the light most favorable to the trial court's judgment. *L.J.M.S.*, 844 S.W.2d at 92.

■ In her first argument, Mother contends the medical neglect alleged to have occurred from October 1989 to March 1990, even if true, was too remote to constitute neglect of a present need under § 211.031.1(1)(a). We disagree.

Clear and convincing evidence was presented indicating that by March 13, 1991, R.G. needed supervised medical care in a hospital and that this need arose based upon a course of neglectful conduct by Mother and Father. Mother and Father's behavior from October 1989 to March 1990 constituted a portion of the evidence establishing that they engaged in a pattern of neglectful behavior by failing to follow medical instructions, refusing to permit diagnostic testing on R.G., refusing to rehospitalize R.G. to determine the best course of treatment, refusing to try diazoxide treatment, and failing to place her under the care of a pediatric endocrinologist for three months. Nothing in § 211.031.1(1)(a) prevents a juvenile court from finding it has jurisdiction over a juvenile based upon the juvenile's need for care arising out of a course of neglectful conduct by the juvenile's parents. *See In the Interest of A.L.W.*, 773 S.W.2d 129, 131 (Mo.App.

1989); *In the Interest of D.R.W.*, 663 S.W.2d 426, 428 (Mo.App.1983).

Mother further argues that this allegation was addressed in a prior juvenile proceeding which was closed in April 1990 without an order of continuing jurisdiction over R.G., pursuant to § 211.041. Thus, Mother concludes, the principles of res judicata and double jeopardy prohibit the trial court from resurrecting this issue.

Mother's argument is inherently inconsistent; she cites both criminal and civil law principles to support her contention. Furthermore, Mother fails to acknowledge that the proceeding was dismissed "without prejudice" on April 12, 1990, indicating that the dismissal was made with no decision on the merits of the case so that it has no res judicata effect. *Estate of Ingram v. Rollins*, 864 S.W.2d 400, 403 (Mo.App.1993); Rule 67.01. Furthermore, double jeopardy applies only in criminal cases, protecting against a second prosecution for the same offense after acquittal or conviction and prohibiting multiple punishments for the same offense. U.S. Const., amend. V; Mo. Const. art. I, § 19; *State v. Bacon*, 841 S.W.2d 735, 739 (Mo.App. 1992); *State v. McIntire*, 813 S.W.2d 97, 98 (Mo.App.1991). The underlying case is not criminal; it did not involve a prosecution or punishment for a criminal offense. Double jeopardy, thus, does not apply.

In her second argument, Mother claims the trial court erred in finding that Mother and Father committed medical neglect by refusing to rehospitalize R.G. in January 1991 because such conduct was not charged in the petition. Mother's contention, however, overlooks a well-established pleading rule. When an issue not raised by the pleadings is tried without objection, the pleadings are deemed to have been amended to conform to that proof. Rule 55.33(b)[5]; *Pike v. Pike*, 609 S.W.2d 397, 400 (Mo. banc 1980); *Bethany Trust Co. v. Harker*, 780 S.W.2d 151, 152 (Mo.App.1989). Evidence concerning Mother and Father's failure to rehospitalize R.G. was admitted without ob-

jection. We must, therefore, treat the petition as having been amended to conform to this proof.

In her remaining arguments, Mother claims there was no clear and convincing evidence she and Father committed medical neglect by interrupting R.G.'s medically prescribed fasting from March 1990 to January 1991, failing to rehospitalize R.G. in January 1991, seeking the advice of an osteopath and failing to give R.G. her medication on March 11, 1991.

The evidence presented indicates that Mother and Father never followed Dr. Aceto's prescribed fasting period. They did not inform Dr. Aceto of this variance and told him they were following his schedule. Furthermore, Dr. Aceto explained to the parents the importance of maintaining a regular fasting period to determine the proper dosage of R.G.'s medication. Mother and Father's failure to follow the fasting schedule prompted the need to rehospitalize R.G. in January 1991 in order to monitor her condition and attempt to discontinue her medication. Dr. Aceto explained to the parents that any attempt by them to discontinue R.G.'s medication without hospital staff supervision would pose a serious threat to R.G.'s health.

In March 1991, Mother and Father, knowing from prior experience that it was imperative R.G. receive treatment from a pediatric endocrinologist, consulted an osteopath without such experience concerning whether they could discontinue R.G.'s medication without rehospitalizing the child. They also failed to completely inform the osteopath of R.G.'s condition. Based upon the osteopath's opinion, Mother then refused to give R.G. her medication. Father later gave the child her medication without informing Mother.

The overwhelming weight of the evidence established that R.G. required close monitoring and treatment to prevent her from becoming extremely hypoglycemic. By March 12, 1991, she was in need of rehospitalization to evaluate and monitor her condition, determine the correct dosage of her medication,

---

**5.** There is no applicable rule governing juvenile court proceedings. Thus, pursuant to Rule 110.04, we may apply this civil procedure rule.

administer her medication, determine whether she could proceed without medication, and perform diagnostic tests to determine the cause of her condition. By constantly bickering with medical personnel, failing to follow prescribed courses of treatment, refusing to rehospitalize R.G. to accurately assess her condition and determine the best course of treatment, seeking the advice of an unqualified physician and failing to properly administer R.G.'s medication, Mother and Father neglected R.G. The juvenile court clearly did not err in determining that R.G. fell under its jurisdiction nor did it base its decision on insufficient evidence. Point denied.

## II.

■ In her second point, Mother claims the trial court erred in failing to include in its order findings that the Division of Family Services [DFS] made reasonable efforts to prevent or eliminate the need for removing R.G. from Mother's home as required under § 211.183. Mother further contends the Juvenile Officer did not offer clear and convincing evidence demonstrating that such efforts were made.

Overlooking the fact that preservation of this point for appellate review is highly questionable, see T.S. v. P.S., 797 S.W.2d 837, 841 (Mo.App.1990), § 211.183 has no application under the facts of this case. The requirements of the statute apply "[in] juvenile court proceedings regarding the removal of a child from his home ..." Here R.G. was taken from the marital home by her Father before the juvenile court proceedings were instituted. She was in Father's custody in the home provided by him from the outset of and throughout these proceedings. Thus, to the extent that R.G.'s home had been with both parents, it was fragmented before the court accepted jurisdiction of the case. Once jurisdiction was found to exist, it became incumbent upon the court to determine if either of the two available homes was suitable for the best interests of R.G. Only if the court decided neither parent could provide a suitable home situation would the requirements of § 211.183 be invoked. The statute is designed to safeguard against the arbitrary removal of a child from his or her parental home and to insure that where such removal is necessary reasonable efforts to reunite the family are undertaken by DFS. However, these goals cannot be achieved where the family unit has ceased to exist and the court is called upon to award physical custody to one parent or the other. Point denied.

## III.

■ In her third point, Mother claims the juvenile court erred in precluding her from entering into evidence five exhibits of communications between Dr. Aceto and Alisse Camazine, an attorney who previously represented Father for a portion of his marital dissolution proceeding, and between Dr. Aceto and Mike Potts, a juvenile officer. Mother claims the exhibits are relevant evidence demonstrating that before March 13, 1991, Camazine helped Dr. Aceto draft a letter to Potts regarding Mother and R.G. which eventually prompted the DFS to take R.G. into protective custody on March 13, 1991, and that Camazine exerted significant influence on Dr. Aceto. Mother argues this evidence is relevant to the objectivity and credibility of Dr. Aceto's assessment of Mother's conduct.

■ The Judicial Officer again contends Mother failed to preserve this point for our review by failing to mention the alleged error in her motion for a rehearing. However, in a juvenile proceeding, a motion for a rehearing—the functional equivalent of a motion for a new trial in a court-tried civil case—is not necessary to preserve any matter for appellate review. Rule 73.01(b); Rowe v. Moss, 656 S.W.2d 318, 322 (Mo.App. 1983). Even if such a motion is filed, "the fact that it may be imperfect does not prejudice the appellant's position on appeal." Centerre Bank of Branson v. Campbell, 744 S.W.2d 490, 496 (Mo.App.1988). The appellant, however, must make some effort to preserve the matter for appellate review by bringing the alleged error to the trial court's attention to give the court an opportunity to correct the error.

While cross-examining Dr. Aceto, Mother referred to the exhibits, which prompted objections from the Juvenile Officer on the grounds of irrelevancy and, for some of the

exhibits, hearsay. Mother offered her explanation as to the relevancy of the questioning. The court sustained the Juvenile Officer's objections. At the close of her case, Mother attempted to enter the exhibits into evidence, again prompting objections from the Juvenile Officer, which the court sustained. Mother referred to her earlier arguments regarding the relevancy of the documents. By presenting her arguments regarding the admissibility of the exhibits, Mother preserved this point for our review.

■ We give substantial deference to the trial court regarding the admissibility of evidence. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991); *In the Interest of S.J.*, 849 S.W.2d 608, 611 (Mo.App.1993). Absent a clear showing of abuse of discretion, we will not interfere with the trial court's ruling. *Id.*

In essence, Mother sought to introduce this evidence to prove that Dr. Aceto, Father, Camazine and Potts conspired to have the juvenile court, through the protective custody order it entered on March 13, 1991, place R.G. in Father's physical custody. This scheme was carried out, Mother argued, to give Father custody of R.G. prior to his filing a petition for dissolution of marriage, on March 14, 1991, thereby ensuring that he would have custody of R.G. during the pendency of the dissolution proceeding until further order from the juvenile court.

■ The test for relevancy is "whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence." *Oldaker*, 817 S.W.2d at 250. As the court below pointed out, evidence of Dr. Aceto's communications with Camazine and Potts have no bearing on the factual issues of this case. Mother failed to demonstrate that this evidence was relevant and material. Point denied.

Judgment affirmed.

GRIMM, C.J., and AHRENS, J., concur.