

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

IN THE INTEREST OF: S.F., )
)
Juvenile, )
)
JUVENILE OFFICER, )
)
Respondent, )
)
v. ) WD86165
)
N.F., ) Opinion filed: January 23, 2024
)
Appellant, )
)
A.S., )
)
Respondent. )

**APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY, MISSOURI**
**THE HONORABLE JON E. BEETEM, JUDGE**

Division Four: Gary D. Witt, Chief Judge,
Alok Ahuja, Judge and W. Douglas Thomson, Judge

N.F. ("Father") appeals the judgment of the Family Court of Cole County, Juvenile Division ("trial court"), placing his juvenile child, S.F. ("Child"), in the legal and physical custody of the Children's Division on the statutory ground that Child has been abused or neglected and is in need of care and treatment.

Father's sole point on appeal asserts the trial court erred in entering its judgment in favor of the Juvenile Officer ("J.O.") because the judgment was not supported by substantial evidence, "such that there was no justification for removing [Child] from Father's home." We disagree, finding there was substantial evidence to support the trial court's judgment. Accordingly, we affirm.

**Factual and Procedural History**

Child has a history of mental health concerns, having been diagnosed with PTSD and depression and prescribed ADHD, depression, and as-needed anxiety medication. Father and Child's natural mother ("Mother") were never married and have not been together as a couple for approximately eight years. Father and Mother also had no custody agreement regarding Child. There was therefore no formal schedule as to when Child would stay with each parent, but Child tended to want to stay with Father and Mother allowed Child to do so as Child pleased.

The family has had multiple contacts with the Cole County Children's Division. Beginning in 2014 and extending to September of 2022, hot lines concerning the family have produced eleven assessments and investigations and two preventive service referrals. These have included allegations of lack of supervision of Child and the parents' other children, blaming, verbal abuse, and physical abuse. Mother has also had a child previously adjudicated and removed from the home.

On three occasions, Child has overdosed on medication, each time occurring while she was staying at Father's home. The first overdose occurred in July of 2021

when Child was thirteen years old. She had taken "Ibuprofen or something" similar and was hospitalized, after which she was admitted to an inpatient care facility where she participated in individual and family therapy for approximately five to seven days. Despite Mother having insurance and appreciating the need for therapy, no therapy was sought for Child after she left the facility. Periodically, Child did go back to a psychiatrist she had seen previously in order to adjust her medication dosages. Child also returned to Father's home.

In December of 2021, a preventative services referral alleged Child was not medicated while at school and that Father was "drinking all the time[,]" among other allegations. This was not the first time – nor would it be the last – that similar reports had been made. Child also exhibited concerning behavior while at school, namely inappropriate conversations, a lack of hygiene, tardiness, sleeping excessively, and appearing to be under the influence of some substance as evidenced by slurring her words and bumping into walls.

With respect to Father's drinking, Mother had expressed concerns regarding Father drinking excessively. Mother testified that he had been sober for eight years but relapsed in the summer of 2021, the same summer Child first attempted to overdose. Father also received a DWI in 2021. He admitted that when he drinks, he drinks all the alcohol he has. Father's drinking also affected Child, as she identified it as a precipitating event to crisis for her.

Also occurring in December of 2021 was a Children's Division investigation into allegations that Child took medication not prescribed to her and that Father

was not keeping medications locked away. The investigation concluded with a recommendation to set up therapy for Child, and a discussion about securing all medications. However, from that time until Child was taken into protective custody in September, 2022, Child attended only one therapy session, in February of 2022.

Child's second overdose occurred in February of 2022. Medication which was supposed to be in a locked box was left unsecured, and Child ingested unprescribed Oxycodone pills. A Children's Division family centered service ("FCS") case was subsequently opened, the purpose of which was to provide the family with mental health services. Also contributing to the opening of the FCS case were "concerns of lack of supervision; the access to the harmful items; [Father]'s drinking; [Mother] repeatedly returning [Child] to [Father]'s home; [and] his care after concerns had been addressed with her."

A safety plan was put in place where Child was to stay with Mother and have no contact with Father, due to concerns of lack of supervision and Child taking medications at Father's home. Therapy for Child was again recommended to the family in April of 2022. Mother represented that Child was in therapy, but upon investigating this information, the family's FCS caseworker learned Child had only attended the one February session and had either cancelled or failed to attend her other therapy appointments. The reason given for these absences was that Child was uncomfortable with an older male therapist and would prefer a female. However, the parents made no immediate attempts to arrange for a different

4

therapist, despite repeated contacts by the FCS caseworker inquiring about Child's therapy.

In early May of 2022, Mother attempted to set up therapy for Child at Compass Health, but was told Child would need an assessment before being assigned a counselor. By the end of May, the parents had not taken Child for her assessment. When the assessment was completed in early June, it recommended Child receive therapy in addition to integrated health specialist ("IHS") services. Child was then assigned to a Compass Health IHS worker within the same month.[1] It was also during this month that the FCS case and safety plan ended, upon which Mother allowed Child to return to Father's home, despite Mother having voiced concerns about Father's ability to supervise Child.

Child continued to see the IHS worker, who referred Child to a therapist in July, 2022. The referral was accepted in August. Upon being informed of the referral's acceptance, it became the parents' responsibility to schedule a therapy appointment. In the time between this acceptance and Child's last overdose in September, 2022, Child never saw a therapist. Additionally, during the summer of 2022, Child reported on multiple occasions that she was not taking her medications. It was Father's responsibility to administer these medications to Child.

On September 1, 2022, when Child was fourteen years old, the Children's Division received a hotline alleging that Child had been hospitalized for overdosing

---

[1] The IHS worker was not a therapist.

on ten to fifteen Hydroxyzine pills while in Father's home. Child had been staying mostly at Father's home between the time the FCS case closed and this overdose. The medication had been kept in a lockbox, the key to which Child found while Father was not home. While at the hospital, Child also admitted to hospital staff that she uses Father's marijuana and alcohol which he kept at his home.

The Children's Division attempted a home visit at Father's, but he denied them access and refused to allow them to see the contents of the lockbox. During a follow-up home visit, Father showed the Children's Division that medication was secured in the lockbox, but empty prescription bottles were also observed in Child's bedroom. Father declined to answer when asked about his alcohol use, but he admitted to using marijuana when the children were not in the home. Father knew Child was receiving psychiatry services and was working with Compass Health, but he was unable to state what services the Child was receiving. Child was not seeing a therapist at that time.

Throughout their services with the Children's Division, the parents failed to complete parenting classes or any other services to help them learn the skills to handle Child's mental health behaviors. They instead expressed resistance to engaging in such services, and also declined services, such as intensive family reunification services ("IFRS") and family therapy. The parents had "good intentions" concerning Child, but "just weren't following through on getting the services in place[,]" specifically therapy.

On September 9, 2022, eight days after Child's third overdose, the J.O. filed an Application for Protective Custody concerning Child. Child was thereafter placed in the legal and physical custody of the Children's Division, which happened to occur on the same day Mother had arranged for Child to enter CenterPointe's inpatient facility. Children's Division ultimately placed the Child at the same CenterPointe facility.

An Amended Petition was filed December 6, 2022, alleging Child is in need of care and treatment of the trial court pursuant to § 211.031.1(1)(a).[2] Among other allegations, it was stated that "[t]he parents have failed to adequately supervise and provide for [Child]'s mental health[.]" Adjudication hearings were held on December 15, 2022 and February 3, 2023, at the conclusion of which the trial court ordered the pleadings amended to reflect the presented evidence.

The trial court made its findings of fact, and found by clear, cogent, and convincing evidence that Child has been abused or neglected under the statute and is in need of care and treatment, and that continuing to allow Child to reside in the home is contrary to her welfare. The trial court specifically found that "the Parents failed to adequately provide treatment and support for the Child's mental health[.]" The court assumed jurisdiction over Child and ordered she remain in the legal and physical custody of the Children's Division for placement in alternative care. It was further ordered that the Children's Division provide efforts toward reunification and visitation.

---

[2] All statutory citations are to RSMo (2022), unless otherwise stated.

Father appeals.[3]

## Standard of Review

"The decision of the juvenile court will be affirmed on appeal unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re A.R.*, 330 S.W.3d 858, 862 (Mo. App. W.D. 2011) (citations omitted). "We will defer to the trial court on issues of fact and the credibility of witnesses." *In Interest of R.G.*, 885 S.W.2d 757, 763 (Mo. App. E.D. 1994) (citations omitted).

> "In reviewing the sufficiency of the evidence, this court views the facts presented in evidence and the reasonable inferences therefrom in the light most favorable to the trial court's judgment." *In Interest of R.A.*, 913 S.W.2d 142, 144 (Mo. App. W.D. 1996)). We ignore evidence contrary to the trial court's ruling. *Interest of Z.N.O.* [*v. R.O.*], 566 S.W.3d [609,] 615 [(Mo. App. W.D. 2018)].
>
> "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the [trial] court's judgment." *England v. England*, 454 S.W.3d 912, 917 (Mo. App. W.D. 2015).

*L.S.H. v. C.H.*, 652 S.W.3d 408, 413 (Mo. App. W.D. 2022) (last alteration in original).

## Analysis

Father's single point on appeal claims the trial court's judgment in favor of the J.O. was not supported by substantial evidence. He specifically argues:

> [Child] was getting at least as much treatment after she was placed in protective custody as she was before where Father and Mother had had her in therapy with at least one therapist regularly and continuously since at least the year 2019, no evidence was presented which established that Father's alcohol use affected [Child]'s behaviors, no evidence was presented

[3] Mother does not appeal any trial court action.

8

that [Child] took progressively more dangerous drugs, and no evidence was presented that Father refused anger management, parenting classes, or family therapy services such that there was no justification for removing [Child] from Father's home.

Section 211.031.1(1)(a) provides the juvenile court or family court exclusive original jurisdiction in proceedings

> [i]nvolving any child who may be a resident of or found within the county and who is alleged to be in need of care and treatment because: . . . [t]he parents, or other persons legally responsible for the care and support of the child, neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being[.]

"[T]he concept of 'neglect' does cover a situation where a parent fails and refuses to offer a child necessary medical attention. This extends to requiring the parent to afford the child treatment for mental and emotional ills[.]" *In re C.F.B.*, 497 S.W.2d 831, 834-35 (Mo. App. 1973) (citations omitted). "To assert jurisdiction under § 211.031.1(1)(a), the juvenile court must find clear and convincing evidence that the child is in need of care and that this need has arisen because the parent has neglected to provide the care necessary for the child's well-being." *In Interest of J.M.P.*, 669 S.W.2d 298, 299 (Mo. App. S.D. 1984) (citations omitted).

Our circumstances here resemble those seen in *In Interest of J.M.P.* There, our Southern District affirmed a judgment placing a child in the custody of the Division of Family Services pursuant to § 211.031.1(1)(a), holding there was sufficient evidence to support the trial court's determination "that clear and convincing evidence established the mother neglected to provide necessary medical treatment . . . ." *Id.* at 298, 300. The child in question had exhibited a

9

variety of behavioral disorders and was in need of psychiatric treatment, which the mother had sought on an outpatient basis. *Id.* at 298-99. The child was later diagnosed as suffering from severe emotional problems attributable to deprivation at home and lack of attachment to significant parent figures. *Id.* at 299. The mother was informed that the child needed residential treatment, and it was determined the child would not benefit from outpatient treatment. *Id.* Nevertheless, the mother made no effort to enroll the child in a residential treatment program, and even when the mother eventually agreed to do so, she ultimately decided against it and failed to enroll the child.[4] *Id.*

Based on these facts, the Southern District determined that "[s]uch failure to follow through on plans for obtaining necessary psychological help for a child constitutes neglect." *Id.* at 300 (citation omitted). The court reached this conclusion despite the mother continuing to seek outpatient treatment for the child, because outpatient treatment "would be of no benefit to the child." *Id.* The court explained, "The choice was to permit the child to remain in the environment that was causing the serious emotional problem or to provide acceptable medical treatment. That was residential treatment which the mother refused to provide." *Id.*

---

[4] Notably, similar to Mother here, on the day J.M.P. was taken into custody by the juvenile authorities, the mother had called the residential treatment facility to arrange an outpatient appointment. *In Interest of J.M.P.*, 669 S.W.2d at 299. That same day, the child was enrolled in the residential treatment program by the juvenile authorities. *Id.* Such last-minute attempts to do what had been recommended for months does not resolve the underlying issue of neglect but rather emphasizes that what was *finally* done *could have been* done earlier.

Here, substantial evidence supported the trial court's finding that Child was abused or neglected and in need of care and treatment. Similar to *In Interest of J.M.P.*, Father and Mother here failed to follow through on plans for obtaining the necessary psychological help for Child. This is most evident in the parents' failure to obtain therapy for Child on a consistent basis. Following Child's first overdose in July, 2021, the parents were informed on multiple occasions that Child needed therapy. Yet they consistently failed to continue or even seek therapy for Child even as Child continued to take unprescribed medications and repeatedly overdose. Indeed, after her first hospitalization following the July, 2021 overdose, the parents did not seek a therapist for Child following her release despite having insurance and appreciating the therapy Child received while in the facility. And, from the conclusion of the December 2021 investigation until Child was taken into protective custody in September of 2022 after another overdose, Child had only one therapy appointment, in spite of repeated recommendations within that timeframe that Child receive therapy. We acknowledge the parents periodically took Child to see a psychiatrist, but this was primarily for medication services and clearly did not take the place of therapy. Such evidence demonstrates Mother and Father were "slow walking" Child's psychological treatment, as found by the trial court.

Moreover, rather than seeking the necessary help for Child, Mother and Father chose to keep Child in a problematic environment. In particular, Mother continued to return Child to Father's home, where each of Child's overdoses

11

occurred. Not only could Father not keep medication locked away from Child, he also drank excessively, a behavior Child explicitly identified as a precipitating event to crisis for her. Additionally, it was Father's responsibility to administer Child's medications to her, yet he consistently failed to do so. Notably, Mother was aware and had even voiced concerns over Father's drinking and ability to supervise; in fact, it was due to concerns of lack of supervision and Child taking medications at Father's home that the safety plan required Child to stay with Mother and have no contact with Father. Nevertheless, Mother continued to allow Child to return to the problematic environment that was Father's home. Considering these facts, we find substantial evidence supported the trial court's judgment.

Father argues he has not neglected Child because "he sought and obtained therapy for [Child] . . . over a considerable period of time spanning several years before September, 2022." He claims the J.O. did nothing more for Child than he and Mother did, asserting the J.O. "did not exercise any parental judgment even equal to [his], much less besting it." In so arguing, he relies heavily on *In re C.F.B.*, 497 S.W.2d 831 (Mo. App. 1973). In that case, the parents of a minor child withdrew her from a program of psychiatric evaluation and treatment, contrary to medical advice. *Id.* at 832. The court held this did not constitute neglect within the meaning of § 211.031, due to the mother having immediately placed the child in a substitute facility and arranged for the child to have an appointment with a private psychiatrist, care that was deemed appropriate. *Id.* at 835. The court therefore reversed the order that had made the child a ward of the juvenile court

12

and had conditioned the parents' custody of the child on her attendance at the withdrawn-from program, stating that the law did not sanction the substitution of state-employed professionals' judgment for that of parents, absent parental neglect. *Id.* at 833, 837.

*In re C.F.B.'s* facts differ from the facts at bar, rendering it inapplicable here. No actions similar to those of the *C.F.B.* mother were taken by either Father or Mother here. As stated, and contrary to Father's assertion, Child had not been seeing a therapist, but rather a psychiatrist, which occurred infrequently and primarily for medication checks. Therapist and psychiatrist visits are different types of services, as Mother admitted. And, psychiatry was not an appropriate substitute treatment for Child. Further, it is evident that Child's psychiatry appointments alone were clearly not helping Child, considering she continued to take unprescribed medication and overdose while receiving psychiatry services. Given these actions, Mother and Father were more like the mother in *In Interest of J.M.P.*, due to their insistence on continuing treatment that was not benefitting Child (psychiatry) instead of providing Child the recommended medical treatment (therapy).

Father's remaining arguments are equally unpersuasive. In further arguing the trial court's judgment was not supported by substantial evidence, he challenges three specific factual findings by the court. Not only do these narrowed arguments ignore the other substantial evidence supporting the trial court's judgment, but contrary to Father's assertion, the challenged findings are supported by substantial

evidence in the record. First, Father contends "no evidence was presented which established that Father's alcohol use affected [Child]'s behaviors[.]" However, the J.O.'s Exhibit 4, an October 2022 Compass Health safety plan, demonstrated that Child identifies Father's drinking as a precipitating event to crisis for her. Additionally, Father ignores evidence of concerns with his excessive drinking and lack of supervision and the connection between the two, Mother's concern about his drinking, and Child admitting to using *his* alcohol.

Second, Father asserts "no evidence was presented that [Child] took progressively more dangerous drugs[.]" He argues "[t]he only two drugs identified at trial were Advil and hydroxyzine, but only hydroxyzine was identified in any of [Child's] suicide attempts." But the evidence established Child *overdosed* on *three different* types of medication, first Ibuprofen or a similar medication, then Oxycodone, and finally Hydroxyzine. While the increased levels of danger presented by these drugs was not set forth in testimony, the trial court could have reasonably inferred from Child's conduct a progressive level of danger in her overdose attempts simply by her repeated efforts. And lastly, Father claims "no evidence was presented that Father refused anger management, parenting classes, or family therapy services . . . ." Yet, testimony demonstrating this exact behavior from Father and Mother was presented. Indeed, there was testimony that the parents expressed resistance to, and failed to complete, parenting classes or any other services to help them learn the skills to handle Child's mental health

14

behaviors. There was also testimony that the parents declined or refused to pursue services such as family therapy and IFRS.

Accordingly, we find there was substantial evidence to support the trial court's judgment that Child has been abused or neglected and is in need of care and treatment pursuant to § 211.031.1(1)(a). Father's Point is denied.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.

15